IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **FRANCISCO NIEVES REYES,**<br><br>Plaintiff,<br><br>v.<br><br>**CVS PHARMACY, INC., et al.,**<br><br>Defendants. | 1:14-cv-00964-MJS<br><br>**ORDER AND FINAL JUDGMENT GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>**(ECF No. 42)** |

On May 11, 2016, Plaintiff Francisco Nieves Reyes, on behalf of himself and others similarly situated (hereinafter collectively referred to as "Plaintiffs"), moved for final approval of a class action settlement. (ECF No. 42.) Defendants CVS Pharmacy, Inc. and Caremark Rx, LLC (hereinafter collectively referred to as "Defendants") filed a statement of non-opposition. (ECF No. 45.)

Plaintiffs' motion was heard on June 10, 2016. Counsel Gregory Karasik appeared on behalf of Plaintiffs, and counsel Jennifer Zargarof appeared telephonically

1  on behalf of Defendants. The matter is deemed submitted and stands ready for
2  adjudication.

3       For the reasons set forth below, the motion will be granted.

4  **I.    BACKGROUND**

5       **A.    Procedural History**

6       This action was filed in Stanislaus County Superior Court on January 30, 2013.
7  (ECF No. 1.) It initially was removed to federal court on March 21, 2013 on grounds of
8  federal question jurisdiction, but remanded on February 12, 2014. (Case No. 13-cv-
9  00420-AWI-GSA, ECF Nos. 1 & 19.) The case again was removed to federal court on
10 June 19, 2014, this time on grounds of diversity jurisdiction under the Class Action
11 Fairness Act ("CAFA"). (ECF No. 1.) Plaintiffs' motion for remand (ECF No. 5) was
12 denied on August 11, 2014 (ECF No. 22).

13      Thereafter, the parties engaged in discovery, including interrogatories, document
14 production, and the depositions of two of Defendants' human resources personnel most
15 knowledgeable about Defendants' payroll practices. The parties also engaged in
16 informal discovery in which Defendants provided Plaintiffs with payroll data for a
17 sampling of employees. Through discovery, Plaintiffs learned that Defendants had a
18 policy of requiring employees to forfeit holiday pay upon termination. The parties agreed
19 to mediate with respect to these claims and, on July 30, 2015, during mediation before
20 Barry Winograd, Esq., the parties reached agreement on material terms of a class action
21 settlement.

22      On October 30, 2015, Plaintiffs moved for preliminary approval of the settlement.
23 (ECF No. 35.) Defendants filed a statement of non-opposition. (ECF No. 37.) The motion
24 was granted. (ECF No. 40). Pursuant to the settlement agreement and the Court's order
25 granting preliminary approval, Plaintiffs filed a first amended complaint. (ECF No. 41.)

26      **B.    First Amended Complaint**

27      Plaintiffs asserts claims for failure to pay vacation wages owed upon termination,
28 failure to pay all wages owed upon termination, and failure to pay final wages timely

1  upon termination, in violation of the California Labor Code; unfair competition under the

2  California Business and Professions Code; and civil penalties under the California Labor

3  Code's Private Attorney General Act of 2004 ("PAGA"). These claims arise from

4  Plaintiffs' allegations that Defendants (1) calculate the amount of employees' accrued

5  vacation on a monthly basis and (2) do not pay accrued but unused holiday pay timely

6  upon termination.

7      Named Plaintiff Francisco Nieves Reyes alleges the following facts: He worked

8  for Defendants in Patterson, California from April 2008 to August 20, 2012. During that

9  time, he earned vacation benefits on a daily basis, at a rate of 6.67 hours per month.

10  Because Defendants only recorded Mr. Reyes's vacation hours as accrued or earned on

11  a monthly basis, they did not pay Plaintiff for vacation hours earned during his final,

12  partial-month pay period of August 4, 2012 to August 20, 2012. Additionally, Mr. Reyes

13  earned one personal "floating" holiday per year. Mr. Reyes did not use his floating

14  holiday during his last year of employment, and therefore was due eight hours of pay

15  upon his termination. Despite being discharged on August 20, 2012, he was not paid for

16  the floating holiday until September 4, 2012.

17      Mr. Reyes seeks to represent similarly situated individuals through a class action.

18  The class is defined as "[a]ll persons who worked for CVS at the La Habra or Patterson

19  Distribution Centers in the state of California, who were subject to collective bargaining

20  agreements (but not including the La Habra Warehouse Agreement), [1] whose

21  employment with CVS ended at any time since January 30, 2009 (for the unpaid

22  vacation wages and late final wages classes) or January 30, 2010 (for the unpaid final

23  wages class), who accrued vacation benefits and/or did not use all accrued floating

24  holiday benefits during their employment with CVS. (ECF No. 41 at 32.) The class is

25  made up of: the unpaid vacation wages class (including all of Defendants' California

26  employees who earned vacation and whose employment ended within the four years

27

28      [1] La Habra and Patterson are Defendants' only Distribution Centers in California.

3

preceding filing of the complaint); the unpaid final wages class (including all of Defendants' California employees who earned vacation and whose employment ended within the three years preceding filing of the complaint); and the late final wages class (including all of Defendants' California employees who did not use all floating holidays accrued, and whose employment ended within the three years preceding filing of the complaint).

### C.    Settlement Agreement

Under the terms of the settlement agreement, Defendants agree to pay the gross settlement amount of $400,000 to resolve the claims of any participating class members. The Settlement Class consists of all persons whose employment at CVS's La Habra, California or Patterson, California Distribution Centers ended any time between January 30, 2009 and October 31, 2015, and who were subject to a collective bargaining agreement, not including the La Habra, California Warehouse Agreements. There are 447 class members. Class members are not required to submit claim forms to receive benefits.

The following deductions will be made from the gross settlement fund:

- $1,000 to the Labor Workforce Development Agency in relation to Plaintiffs' PAGA claim;

- Up to $5,000 to named Plaintiff Mr. Reyes as an incentive award for his services and participation as class representative;

- Up to $100,000 (25 percent of the gross settlement fund) to class counsel for attorney fees;

- Up to $10,000.00 in legal costs and expenses; and

- $6,500 in claims administration costs.

After subtracting these deductions from the gross settlement fund, the net settlement fund is estimated to be approximately $277,500. It will be divided equally among participating class members and also used to pay Defendants' share of payroll taxes associated therewith. Ninety percent of the Settlement Award will be allocated to

1    penalties and interest. Ten percent of the Settlement Award will be allocated to wages.

2    Unclaimed settlement checks shall escheat to the State of California's Bureau of

3    Unclaimed Property. No settlement funds will revert to Defendants.

4              **D.     Preliminary Settlement Administration**

5              Pursuant to the settlement agreement and the Court's preliminary approval order,

6    the settlement administrator mailed, on March 3, 2016, Court-approved Notices of

7    Proposed Class Action Settlement and Final Approval Hearing to the 447 class

8    members. Some notices were returned as undeliverable and 19 notices were re-sent.

9    Ultimately, six notices remained undeliverable.

10   Defendants also mailed notices of the proposed settlement to the following

11   attorneys general on March 25, 2016: the United States, California, Georgia, Nevada,

12   Missouri, and Texas. (ECF No. 49.) At least one member of the settlement class resides

13   in each of these states, according to Defendants' records of each class member's last

14   known address.

15   The deadline to submit requests for exclusion or objections to the settlement was

16   April 2, 2016. The settlement administrator reported that there were no requests for

17   exclusion or objections to the settlement within the time period specified in the notice. As

18   of June 27, 2016, no objections were received from any of the attorneys general.

19   **II.   LEGAL STANDARD**

20   The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of

21   class actions. Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). The

22   settlement of a certified class action must be fair, reasonable, and adequate. Fed. R.

23   Civ. P. 23(e)(2). But, where the "parties reach a settlement agreement prior to class

24   certification, courts must peruse the proposed compromise to ratify both the propriety of

25   the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938,

26   952 (9th Cir. 2003). In these situations, settlement approval "requires a higher standard

27   of fairness and a more probing inquiry than may normally be required under Rule 23(e)."

28

1  Dennis v. Kellogg Co., 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotation

2  marks omitted).

3  **III.   CLASS CERTIFICATION**

4          In the Court's order granting preliminary settlement approval, the Court

5  provisionally certified the settlement class. (ECF No. 40.) None of the information

6  submitted with the motion for final approval undermines the Court's previous

7  determination. The Court will briefly review the factors applicable to class certification

8  and its determination that certification of the settlement class is appropriate.

9          To certify a class, a plaintiff must demonstrate that all of the prerequisites of Rule

10  23(a), and at least one of the requirements of Rule 23(b) of the Federal Rules of Civil

11  Procedure have been met. Wang v. Chinese Daily News, Inc., 737 F.3d 538, 542 (9th

12  Cir. 2013). When determining whether to certify a class for settlement purposes, a court

13  must pay "heightened" attention to the requirements of Rule 23. Amchem Prods., Inc. v.

14  Windsor, 521 U.S. 591, 620 (1997); Narouz v. Charter Commc'ns., LLC, 591 F.3d 1261,

15  1266 (9th Cir. 2010). Indeed, "[s]uch attention is of vital importance, for a court asked to

16  certify a settlement class will lack the opportunity, present when a case is litigated, to

17  adjust the class, informed by the proceedings as they unfold." Amchem Prods., Inc., 521

18  U.S. at 620.

19          In order to depart from the usual rule that litigation is conducted by individually

20  named parties, "a class representative must be part of the class and 'possess the same

21  interest and suffer the same injury' as the class members." Wal-Mart Stores, Inc. v.

22  Dukes (Wal-Mart), 131 S.Ct. 2541, 2550 (2011) (citation omitted). Rule 23(a) provides

23  that the named plaintiffs are appropriate representatives where: "(1) the class is so

24  numerous that joinder of all members is impracticable; (2) there are questions of law or

25  fact common to the class; (3) the claims or defenses of the representative parties are

26  typical of the claims or defenses of the class; and (4) the representative parties will fairly

27  and adequately protect the interests of the class." These requirements ensure that the

28  class claims are limited to those fairly encompassed by the named plaintiff's claims. Wal-

Mart, 131 S.Ct. at 2550.

Additionally, Plaintiffs seek certification of a class under Federal Rule of Civil Procedure 23(b)(3), which requires that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Finally, it is noted:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc. We recognized in [Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147 (1982)] that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."

Wal-Mart, 131 S. Ct. at 2551 (citations omitted) (emphasis in original).

### A.      Numerosity

The numerosity requirement is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Factors relevant to this requirement include: (1) the number of individual class members; (2) the ease of identifying and contacting class members; (3) the geographical spread of class members; and (4) the ability and willingness of individual members to bring claims, as affected by their financial resources, the size of the claims, and their fear of retaliation in light of an ongoing relationship with the defendant. See, e.g., Twegbe v. Pharmaca Integrative Pharm., Inc., 2013 U.S. Dist. LEXIS 100067, 2013 WL 3802807 (N.D. Cal. July 17, 2013), and sources cited therein.

Here, the settlement class is comprised of 447 members[2] and is therefore numerous and easily identified. Additionally, only six Notices to class members were

---

[2] The parties previously estimated the number of class members as 440. At the hearing, Plaintiffs' counsel explained that this number increased because the class includes members whose employment terminated up to October 31, 2015, after the mediation. Counsel explained that this level of "creep" is within the range of what had been anticipated.

1   ultimately undeliverable. (Id.) Accordingly, on the whole, the class is easy to locate and

2   contact. The value of the individual claims makes individual actions unlikely and

3   inefficient. Based on these factors, the Court concludes the numerosity requirement is

4   satisfied.

5         **B.    Commonality**

6        The commonality requirement is satisfied when a plaintiff shows that "there are

7   questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs' claims

8   must depend upon a common contention that it is capable of classwide resolution –

9   "which means that determination of its truth or falsity will resolve an issue that is central

10  to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551.

11       Common questions abound in this action. Did Defendants record vacation time on

12  a monthly basis? Did they, as a result, fail to pay class members all earned vacation time

13  upon termination? Did Defendants fail to pay class members all wages owed upon

14  termination? Answers to these common questions will substantially drive the litigation

15  and resolve issues central to the validity of several of Plaintiffs' claims. See Wal-Mart,

16  131 S. Ct. at 2551.

17       There is, however, one area in which class members do not appear to be

18  uniformly situated: the forfeiture of unused floating holiday pay. Plaintiff alleges that

19  Defendants had a policy requiring forfeiture of unused floating holidays upon termination.

20  However, this policy apparently was not applied uniformly to all class members. Plaintiff

21  Reyes, for example, was paid his floating holiday pay, although belatedly. Thus, it

22  appears the class may contain members who were not paid floating holiday pay at all,

23  those who were paid late, and even those who used all of the floating holiday pay they

24  earned and thus are owed nothing. Therefore, asking whether Defendants have a policy

25  requiring forfeiture of holiday pay, standing alone, will not resolve Plaintiffs' claims.

26       Nevertheless, Rule 23(a)(2) is to be construed permissively. Hanlon v. Chrysler

27  Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). "All questions of fact and law need not be

28  common to satisfy the rule. The existence of shared legal issues with divergent factual

1   predicates is sufficient, as is a common core of salient facts coupled with disparate legal

2   remedies within the class." Id. Here, class members share common legal issue of unpaid

3   vacation wages, unpaid final wages, and late final wages. Unpaid floating holidays are

4   but one factual predicate upon which these claims rest. The Court concludes that the

5   factual variations are insufficient to defeat commonality.

6       Accordingly, the Court concludes the commonality requirement is satisfied.

7       **C.      Typicality**

8       Typicality ensures that Plaintiff Reyes is the proper party to proceed with the suit.

9   The test is "whether other members have the same or similar injury, whether the action

10  is based on conduct which is not unique to the named plaintiffs, and whether other class

11  members have been injured by the same course of conduct." Hanon v. Dataproducts

12  Corp., 976 F.2d 497, 508 (9th Cir. 1992). "Under the rule's permissive standards,

13  representative claims are 'typical' if they are reasonably co-extensive with those of

14  absent class members; they need not be substantially identical." Hanlon, 150 F.3d at

15  1020.

16      With the exception of claims concerning forfeited floating holiday wages, the

17  claims of Mr. Reyes are substantially identical to those of the other class members. The

18  claims for late and/or forfeited floating holiday pay are reasonably co-extensive. These

19  claims involve similar legal issues and only minor factual variations.

20      Accordingly, the typicality requirement is satisfied.

21      **D.      Adequacy of Representation**

22      A plaintiff may bring claims on behalf of a class only if he "will fairly and

23  adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two

24  questions determines legal adequacy: (1) do the named plaintiffs and their counsel have

25  any conflicts of interest with other class members, and (2) will the named plaintiffs and

26  their counsel prosecute the action vigorously on behalf of the class?" Hanlon, 150 F.3d

27  at 1020 (citation omitted).

28      The Court has no reason to believe there is a conflict of interest between Plaintiff

9

or his counsel and other class members. Given the similarity between Plaintiff's claims and those of the absent class members, Plaintiff and his counsel are likely to vigorously prosecute this action on behalf of the class. Accordingly, the Court concludes that Plaintiff is an adequate class representative.

**E.    Rule 23(b)(3)**

This provision requires the Court to find that: (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Common legal questions predominate with respect to Plaintiff's claims. Minor factual variations in the amounts owed to each Plaintiff do not predominate over these common legal questions. A class action is clearly superior to and more efficient than the adjudication of 447 individual wage and hour claims.

Accordingly, the requirements of Rule 23(b)(3) are met.

**F.    Conclusion**

Based on the foregoing, the Court concludes that the requirements of Rule 23(a) and (b)(3) are met. Accordingly, the Court will certify the settlement class.

**III.    FINAL APPROVAL OF SETTLEMENT AGREEMENT**

**A.    Legal Standard**

"The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "Adequate notice is critical to court approval of a class settlement under Rule 23(e)." Hanlon, 150 F.3d at 1025. In addition, Rule 23(e) "requires the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable." Id. at 1026. To determine whether a settlement is fair, reasonable, and adequate, the district court may consider a number of factors: (1) the strength of plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the

stage of the proceedings; (6) the experience and views of counsel; and (7) the reaction of the class to the proposed settlement. Molski v. Gleich, 318 F.3d 937, 953 (9th Cir. 2003); Hanlon, 150 F.3d at 1026.

Settlements that occur before formal class certification also require a higher standard of fairness. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000); Hanlon, 150 F. 3d at 1026. In reviewing such settlements, the court also must ensure that "the settlement is not the product of collusion among the negotiating parties." In re Bluetooth Headset Prods. Liab. Litig. ("Bluetooth"), 654 F.3d 935, 946-47 (9th Cir. 2011). In this regard, the district court has a fiduciary duty to look after the interests of absent class members. Allen v. Bedolla, 787 F.3d 1218, 1223 (2015); see also Hanlon, 150 F.3d at 1026; Staton, 327 F.3d at 972 n.22 (9th Cir. 2003) (it is the district court's duty to police "the inherent tensions among class representation, defendant's interests in minimizing the cost of the total settlement package, and class counsel's interest in fees.").

## B.    Adequacy of Notice

"The class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice [and] the notice must indicate that a dissident can object to the settlement and to the definition of the class . . . ." Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).

Here, the Court previously approved the procedures for notifying the class. The settlement agreement required the claims administrator to send an approved notice to each class member. The approved notice clearly outlined the procedures class members were to follow to object to or opt-out of the settlement. The administrator was to send the notices via first-class mail using the National Change of Address Database and a Database Report compiled by Defendants and including the last known address of potential class members. If the notice was returned, it would be sent to the forwarding address affixed thereto, if any. If no forwarding address was provided, the claims

1   administrator would attempt to locate the potential class member using a single skip-

2   trace, computer, or other search, and would re-mail the notice. If the notice still was not

3   received, the intended recipient would be considered a settlement class member and

4   bound by the terms of the settlement, including the release provisions, and final

5   judgment in this action. However, he or she would not receive a settlement award.

6        Plaintiffs have submitted a declaration from the claims administrator stating that

7   the Court-approved Notices of Proposed Class Action Settlement and Final Approval

8   Hearing were mailed to the 447 class members pursuant to the procedures described

9   above. (ECF No. 42-4.) Some notices were returned as undeliverable and 19 notices

10   were re-sent. Ultimately, only six notices remained undeliverable. This represents a non-

11   delivery rate of 1.3%. Based on these representations, the Court concludes that the

12   notice in this case was adequate. Boring v. Bed Bath & Beyond, No. 12-CX-05259-JST,

13   2014 WL 2967474, at *1 (N.D. Cal. June 30, 2014) (finding adequate notice where

14   parties implemented approved notice plan and only "twenty-seven of the 1,374 class

15   notices [representing 1.97% of the notices initially sent] were returned undeliverable

16   after a second attempt and a skip trace").

17        **C.    Fairness, Adequacy and Reasonableness**

18              **1.    Strength of Plaintiffs' Case**

19        "Courts cannot know the strength of *ex ante* legal claims and so are not privy to

20   the relative strengths of the parties at the bargaining table." Staton, 327 F.3d at 959. In

21   light of this difficulty, approval of a class settlement is appropriate when "there are

22   significant barriers plaintiffs must overcome in making their case." Chun–Hoon v. McKee

23   Foods Corp., 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).

24        Here, Plaintiffs' likelihood of success in this action is by no means a foregone

25   conclusion. See Staton, 327 F.3d at 962. While the legal standards applicable to

26   Plaintiffs' claims appear to be reasonably well-settled, factual issues are, and are likely

27   to remain, in dispute. Some of the causes of action ultimately may be unsubstantiated.

28   Proving Plaintiffs' claims likely will require substantial additional discovery.

At the hearing on Plaintiffs' motion, the parties identified particular difficulties with regard to Plaintiffs' claim for floating holiday pay. While Defendants have readily identified former employees whose employment ended during the relevant time period, they were unable to identify with precision the employees who forfeited their floating holiday pay upon termination. Indeed, to do so likely would require substantial individualized research and, potentially, individual depositions. The parties first would be required to determine which employees were eligible for floating holiday pay, as such eligibility hinged on factors such as length of employment and whether an employee was on leave at the time of termination. The parties then would have to review payroll records to determine whether eligible employees took or were paid for floating holidays. However, doing so is complicated by the state of Defendants' payroll records, which use a single "code" for numerous holidays. Without further individual inquiry, either informally or through deposition, there would be no way to determine whether the "code" used on an individual employee's final paystub represented floating holiday pay or some other holiday. Furthermore, even individual depositions may prove fruitless, as employees whose employment terminated in 2009 may be unable to recall, seven years later, whether they took a floating holiday during their final year of employment. For the same reason, surveying a sampling of employees likely would prove to be minimally productive. Finally, Defendants represented that the labor union would be unable to provide information regarding which employees forfeited holiday pay as the union is or was of the belief that holiday pay was always forfeited upon termination.

The Court finds that the level of uncertainty described above weighs in favor of settlement approval. See Staton, 327 F.3d at 962; Moore v. Verizon Communications Inc., C 09–1823 SBA, 2013 WL 4610764, at *5 (N.D. Cal. Aug. 28, 2013) (finding that the strength of plaintiff's case favored settlement because plaintiff admitted that it would face hurdles in establishing class certification, liability, and damages).

### 2.    Risks of Further Litigation

If this litigation continues, Plaintiff is at risk of being denied class certification or of

1  having a certified class later decertified. Due to deficits in Defendants' payroll records,

2  described above, it is likely that significant and costly additional discovery will need to be

3  conducted, both to support class certification and to prevail on the merits. In particular,

4  extensive depositions may be required to determine which class members forfeited

5  floating holiday pay because this information was not clearly identified in Defendants'

6  payroll records. Due to the passage of time, the parties may be unable to definitively

7  resolve this issue, even with individual depositions of numerous class members.

8        Furthermore, Defendants can be expected to vigorously dispute certification and

9  the substantive claims, just as they have already twice vigorously disputed remand of

10  this action to state court. Although the issues in this case are not complex, litigation

11  remains in the early stages and is likely to continue for some time. Settlement at this

12  stage appropriately balances counsel's ability to develop an informed position with the

13  desire to minimize risk, expense, and delay. See Rodriguez v. W. Publ'g Corp., 563 F.3d

14  948, 966 (9th Cir. 2009) (noting that difficulties and risks in litigation weigh in favor of

15  settlement approval).

16                    **3.    Risk of Maintaining Class Status**

17        The Court has no doubt that Defendants will contest Plaintiffs' motion for class

18  certification if the settlement is not approved. Moreover, although the Court has stated its

19  intent to certify the settlement class, noted weaknesses regarding commonality and

20  typicality described above could ultimately prove fatal to certification on a contested

21  motion. This is particularly true in light of the difficulties in identifying class members who

22  forfeited floating holiday pay. If the class is not certified, unnamed class members would

23  be unlikely to pursue individual actions, thus leaving them with no recovery. These risks

24  weigh in favor of settlement approval. See Chun-Hoon, 716 F. Supp. 2d at 851 (holding

25  that this factor supports approving a settlement when both parties acknowledge the

26  possibility of decertification).

27                    **4.    Amount of Settlement**

28        The Court previously concluded that the settlement amount appeared to be within

the range of possible approval, but stated that this issue nonetheless would be closely scrutinized during the final approval stage.

Plaintiffs contend that the gross settlement reflects an excellent result because the amount of settlement benefits payable to class members represents a significant percentage of the maximum damages that would be awarded if Plaintiffs obtained a judgment in their favor. In this regard, Plaintiffs estimate Defendants' maximum liability at approximately $1,000,000. The gross settlement reflects approximately 40 percent of this maximum liability.

Plaintiffs arrive at the $1,000,000 figure as follows:

Based on a review of Defendants' records and other information provided confidentially by Defendants, Plaintiffs estimate that 225 former employees (approximately 50% of the class) were not paid all of their unused holiday pay upon termination. The average wage rate for these employees was $19.45. Thus, Plaintiffs multiplied the estimated number of aggrieved class members (225) by the number of hours in a work day (8) by the average wage rate ($19.45) to value the allegedly forfeited holiday pay at $35,010. This amount then was multiplied by 30 to calculate the maximum amount of penalties recoverable under Labor Code Section 203, i.e., $1,050,300 (225 x 8 x $19.45 x 30).

The Court notes technical issues with Plaintiff's calculations. First, the maximum recovery on this claim is not $1,050,300, but $1,085,310 (waiting time penalties of $1,050,300 plus $35,010 of wages owed). Using this sum, the gross settlement fund represents approximately 37 percent of Defendants' total maximum liability.

Additionally, Plaintiffs' estimation does not account for damages associated with the claim for forfeited vacation pay. These damages, however, appear to be relatively minimal. The average number of forfeited vacation hours per employee is not known to the Court. However, the Court notes that named Plaintiff Reyes accumulated vacation pay at a rate of 6.67 hours per month. Even if each class member forfeited six hours of vacation pay at an average wage of $19.45, the total liability for all class members would

equal only $52,164.90 (6 x $19.45 x 447). Plaintiffs would not be entitled to additional waiting time penalties, as Labor Code section 203 provides penalties for the failure to pay any and all wages owed upon termination; multiple awards do not accrue for multiple violations.

Thus, adding in a generous estimation of forfeited vacation pay, the Court concludes that Defendants' total maximum liability is approximately $1,137,475 ($1,085,310 + $52,165). The settlement of $400,000 represents approximately 35% of the total maximum liability.

The Court notes that Plaintiffs here can obtain the maximum amount of potential penalties only by showing that Defendant *willfully* violated the Labor Code. The parties have indicated that Defendant will contest willfulness, and indeed may have a good faith basis for doing so based on the applicable collective bargaining agreements. Furthermore, Plaintiffs will recover as a class only if they obtain certification, which may be difficult given the issues described above. The Court therefore concludes that the settlement value weighs in favor of approval. See Smith v. Am. Greetings Corp., No. 14-cv-02577-JST, 2016 WL 2909429, at *5 (N.D. Cal. May 19, 2016) (approving settlement valued at 42 percent of maximum potential damages where plaintiffs would have to prove willful violation of the Labor Code).

### 5.    Extent of Discovery

Although discovery in this action was not concluded at the time the parties reached an agreement, substantial discovery did occur. Based on the information provided, it is apparent that formal and informal discovery provided Plaintiffs' counsel with adequate information to assess the strengths and weaknesses of the case. Thereafter, the parties engaged in arm's length negotiations before a mediator with substantial experience in these types of claims. Settlement was reached only after the parties had the opportunity to develop an informed view of their respective positions.

The discovery and proceedings conducted thus far weigh in favor of settlement approval. See In re Omnivision Techs. Inc. ("Omnivision"), 559 F. Supp. 2d 1036, 1042

1   (N.D. Cal. 2008) (finding the parties were sufficiently informed about the case prior to

2   settling because they engaged in discovery, took depositions, briefed motions, and

3   participated in mediation).

4                    **6.      Counsel's Experience**

5          Plaintiffs' counsel has extensive experience litigating wage and hour class

6   actions. Counsel also has demonstrated that he is sufficiently informed about this case

7   to make recommendations regarding settlement approval. Counsel views the settlement

8   as an extremely favorable result that would best serve the interest of class members,

9   and attests that the settlement represents an excellent result in light of the risks and

10  uncertainty of continued litigation. In light of counsel's substantial experience, these

11  views weigh in favor of settlement approval.

12                   **7.      Reaction of the Class**

13         No class members opted out of the settlement or objected to the settlement. This

14  uniformly positive reaction supports approval of the settlement. See In re Omnivision,

15  559 F. Supp. 2d at 1043 (finding that lack of objection by class members favors approval

16  of the settlement).

17                   **8.    Conclusion**

18         Upon review of these factors, the Court finds the settlement is fair, adequate, and

19  reasonable.

20         **D.     Absence of Collusion**

21         The Court must examine the settlement for evidence of collusion, including "subtle

22  signs that class counsel have allowed pursuit of their own self-interests and that of

23  certain class members to infect the negotiation." Bluetooth, 654 F.3d at 946. Such signs

24  include: (1) a disproportionate distribution of the settlement fund to counsel;

25  (2) negotiation of a "clear sailing" arrangement for payment of attorney's fees separate

26  and apart from class funds; and (3) an arrangement for funds not awarded to revert to

27  defendant. Id. at 947.

28         As to the first factor, in common fund settlements such as that presented here, the

1   Ninth Circuit sets a "benchmark" fee award at 25 percent of the recovery obtained. See

2   In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 949 (9th Cir. 2015); Bluetooth,

3   645 F.3d at 942. Here, Plaintiffs request for $100,000 in attorney's fees is equal to 25

4   percent of the $400,000 gross settlement amount.

5           As to the second factor, the settlement agreement contains a clear sailing

6   provision in that Defendant agrees not to oppose a request for attorney's fees up to

7   $100,000. "Although clear sailing provisions are not prohibited, they by their nature

8   deprive the court of the advantages of the adversary process in resolving fee

9   determinations and are therefore disfavored." Bluetooth, 654 F.2d at 949 (internal

10  quotation marks and alternations omitted) (quoting Weinberger v. Great Northern

11  Nekoosa Corp., 925 F.3d 518, 525 (1st Cir. 1991)). "[W]hen confronted with a clear

12  sailing provision, the district court has a heightened duty to peer into the provision and

13  scrutinize closely the relationship between attorneys' fees and benefit to the class, being

14  careful to avoid awarding 'unreasonably high' fees simply because they are

15  uncontested." Id. at 948 (citing Staton, 327 F.3d at 954). "As the Ninth Circuit has

16  explained, however, a 'clear sailing' provision 'does not signal the possibility of collusion'

17  where, as here, Class Counsel's fee will be awarded by the Court from the same

18  common fund as the recovery to the class." In re High-Tech Employee Antitrust Litig.,

19  No. 11-cv-02509-LHK, 2015 WL 5158730, at *14 (N.D. Cal. Sept. 2, 2015) (quoting

20  Rodriguez, 563 F.3d at 961 n.5. Because fees in this case will be awarded from the

21  common fund, the clear sailing provision does not weigh against settlement approval.

22          As to the third factor, unpaid settlement funds do not revert back to the

23  Defendants. The net settlement fund is divided equally among participating class

24  members. Unclaimed settlement checks shall escheat to the State of California's Bureau

25  of Unclaimed Property.

26          Upon consideration of these factors, the Court finds no signs of collusion that

27  would caution against settlement approval.

28

1    **IV.    Attorney's Fees and Costs**

2           Attorney's fees and nontaxable costs "authorized by law or by the parties'

3    agreement" may be awarded pursuant to Rule 23(h). Under the settlement agreement,

4    Class Counsel is entitled to a fee award of up to $100,000, representing 25 percent of

5    the settlement fund, and costs up to $10,000.

6           **A.    Attorney's Fees**

7           Class counsel requests an award of $100,000 in attorney's fees.

8           The court "ha[s] an independent obligation to ensure that the award [of attorney's

9    fees], like the settlement itself, is reasonable, even if the parties have already agreed to

10   an amount." Bluetooth, 654 F.3d at 941; see also Zucker v. Occidental Petroleum Corp.,

11   192 F.3d 1323, 1328 (9th Cir. 1999) ("[T]he district court must exercise its inherent

12   authority to assure that the amount and mode of payment of attorneys' fees are fair and

13   proper.").

14          Where, as here, fees are to be paid from a common fund, the relationship

15   between the class members and class counsel "turns adversarial." In re Wash. Pub.

16   Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1302 (9th Cir. 1994). In such cases, the

17   district court must assume a fiduciary role for the class members in evaluating the

18   request for attorney's fees. Id.; Rodriguez, 563 F.3d at 968 ("[W]hen fees are to come

19   out of the settlement fund, the district court has a fiduciary role for the class").

20          The Ninth Circuit has approved two methods of evaluating requests for attorney's

21   fees in cases where the attorney's fee award is taken from the common fund: the

22   "percentage of the fund" method and the "lodestar" method. Vizcaino v. Microsoft Corp.,

23   290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains

24   discretion to choose either method. Id. Under either approach, "[r]easonableness is the

25   goal, and mechanical or formulaic application of either method, where it yields an

26   unreasonable result, can be an abuse of discretion." Fischel v. Equitable Life Assurance

27   Soc'y of the U.S., 307 F.3d 997, 1007 (9th Cir. 2002).

28          Because this case involves a common settlement fund with an easily quantifiable

1  benefit to the class, the Court first will evaluate attorney's fees using the percentage of

2  fund method, but will incorporate a lodestar cross-check to ensure the reasonableness of

3  the award. See Bluetooth 654 F.3d at 944, Vizcaino, 290 F.3d at 1047.

4          **1.   Percentage of Fund**

5          Under the percentage of the fund method, the court may award class counsel a

6  given percentage of the common fund recovered for the class. The percentage method

7  is particularly appropriate in common fund cases because "the benefit to the class is

8  easily quantified." Bluetooth, 654 F.3d at 942. In the Ninth Circuit, 25 percent of the

9  common fund is the "benchmark" for a reasonable attorney's fee award. Bluetooth, 654

10  F.3d at 942 (quoting Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301,

11  1311 (9th Cir. 1990)). However, courts may adjust this figure upwards or downwards if

12  the record shows "'special circumstances' justifying a departure." Id.

13          To assess whether the percentage requested is reasonable, courts may consider

14  a number of factors, including "the extent to which class counsel achieved exceptional

15  results for the class, whether the case was risky for class counsel, whether counsel's

16  performance generated benefits beyond the cash settlement fund, the market rate for

17  the particular field of law (in some circumstances), the burdens class counsel

18  experienced while litigating the case (e.g., cost, duration, foregoing other work), and

19  whether the case was handled on a contingency basis." In re Online DVD-Rental

20  Antitrust Litigation, 779 F.3d at 954-55 (internal quotation marks omitted).

21          Here, the requested award of $100,000 is 25 percent of the common fund and

22  therefore is in line with the "benchmark" for a reasonable attorney's fees. The results

23  obtained and amount of work counsel performed on this case support the benchmark

24  award. See Hensley v. Eckerhart, 461 U.S. 424, 436 (1983) (noting that the "most critical

25  factor" to the reasonableness of an attorney fee award is "the degree of success

26  obtained"). This action was twice removed to federal court, resulting in class counsel

27  filing two motions for remand, one of which was successful. Class counsel also engaged

28  in formal and informal discovery, including the review of apparently voluminous records

1  regarding Defendants' payroll policies. Counsel also engaged in mediation and

2  extensive negotiations over settlement details, ultimately resulting in a pre-certification

3  settlement. The settlement, if approved, will result in recovery that individual class

4  members would be unlikely to obtain on their own. The Court concludes that this result

5  renders the 25 percent benchmark attorney's fee award reasonable.

6  **2.    Lodestar**

7  The Court determines the lodestar amount by multiplying a reasonable hourly rate

8  by the number of hours reasonably spent litigating the case. See Ferland v. Conrad

9  Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001). There is a strong presumption that

10  the lodestar is a reasonable fee.  Gonzalez v. City of Maywood, 729 F.3d 1196, 1202

11  (9th Cir. 2013); Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008).

12  **a.    Hourly Rate**

13  "The first step in the lodestar analysis requires the court to determine a

14  reasonable hourly rate for the fee applicant's services. This determination involves

15  examining the prevailing market rates in the community charged for similar services by

16  lawyers of reasonably comparable skill, experience, and reputation." Cotton v. City of

17  Eureka, 889 F. Supp. 2d 1154, 1166 (N.D. Cal. 2012) (internal quotation marks and

18  citation omitted); see also Camacho, 523 F.3d at 979. The "relevant community" for the

19  purposes of determining the reasonable hourly rate is the district in which the lawsuit

20  proceeds. Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997). "The fee applicant has the

21  burden of producing satisfactory evidence . . . that the requested rate is in line with those

22  prevailing in the community." Jordan v. Multnomah Cnty., 815 F.2d 1258, 1263 (9th Cir.

23  1987). In addition to affidavits from the fee applicant himself, other evidence of prevailing

24  market rates may include affidavits from other area attorneys or examples of rates

25  awarded to counsel in previous cases. See Cotton, 889 F. Supp. 2d at 1166-67 (citation

26  omitted). However, the actual rate that the fee applicant charged is not evidence of the

27  prevailing market rate. Id. at 1167 (citing Schwarz v. Sec'y of Health & Human Servs., 73

28  F.3d 895, 898 (9th Cir. 1995)).

Here, counsel avers that his lodestar rate for this action is between $600 and $765, depending on prevailing local market rates. However, these rates not in accord with the market rate for the relevant community. The "relevant community" for purposes of determining the prevailing market rate is generally the "forum in which the district court sits." Camacho, 523 F.3d at 979. Thus, when a case is filed in the Fresno Division of the Eastern District of California, "[t]he Eastern District of California, Fresno Division, is the appropriate forum to establish the lodestar hourly rate . . ." See Jadwin v. Cnty. of Kern, 767 F. Supp. 2d 1069, 1129 (E.D. Cal. 2011).

The fee applicant bears a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The applicant meets this burden by "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Id.; see also Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate." (citations omitted)) Plaintiffs' counsel has offered no evidence that the rate he seeks in this action is typical for attorneys practicing in this District. Moreover, the hourly rate sought by counsel far exceeds rates regularly awarded in the Fresno Division of the Eastern District of California.

To illustrate, in a recent case filed in the Sacramento Division of the Eastern District of California, attorneys in a wage and hour class action requested hourly rates from $495 to $650. Ontiveros v. Zamora, Case No. 2:08-657-WBS-DAD, 303 F.R.D. 356, 373 (E.D. Cal. 2014). The Court noted that the hourly rates were "high for even the most experienced attorneys in the Eastern District." Id. at 374 (citations omitted). Consequently, the Court calculated the lodestar using $400 as the hourly rate for more seasoned attorneys and $175 as the rate for associate attorneys. Id. Although Ontiveros

1  was filed in the Sacramento Division of the Eastern District, it demonstrates that the

2  hourly rate requested here does not align with those in the Eastern District.

3  Recently, this Court has reviewed the billing rates for the Fresno Division and

4  concluded that "hourly rates generally accepted in the Fresno Division for competent

5  experienced attorneys [are] between $250 and $380, with the highest rates generally

6  reserved for those attorneys who are regarded as competent and reputable and who

7  possess in excess of 20 years of experience." Silvester v. Harris, No. 1:11-CV-2137 AWI

8  SAB, 2014 U.S. Dist. LEXIS 174366, 2014 WL 7239371, at *4 (E.D. Cal. Dec. 17, 2014).

9  For attorneys with "less than ten years of experience . . . the accepted range is between

10  $175 and $300 per hour." Id. (citations omitted). With these parameters in mind, the

11  Court concludes that a reasonable hourly rate for class counsel, who has over 30 years

12  of experience, is $350 per hour. Based upon a survey of the hourly rates in the Fresno

13  Division and the Court's own knowledge, this hourly rate is reasonable. See Silvester,

14  2014 U.S. Dist. LEXIS 174366, 2014 WL 7239371 at *4; see also Ingram v. Oroudjian,

15  647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its

16  discretion either by relying, in part, on its own knowledge and experience" to determine

17  reasonable hourly rates).

18  **b.    Hours Expended**

19  Counsel asserts that he has spent 148 hours on this case. This figure does not

20  include additional, anticipated hours spent during the final approval stage, nor the hours

21  of co-counsel. The Court has reviewed counsel's detailed time records and concludes

22  that the hours billed are reasonable.

23  **c.    Lodestar Calculation**

24  With the hourly rate set forth above and hourly amounts as stated by Counsel, the

25  lodestar in this action is $51,800 (148 hours x $350/hour). This is well below the

26  $100,000 benchmark under the percentage of fund method. Indeed, for the lodestar to

27  approach the benchmark, the Court is required to apply a lodestar multiplier of 1.93. That

28  is to say, the benchmark is nearly double the lodestar amount. Nevertheless, there is

1   amply authority for such a multiplier; indeed, much higher multipliers are the norm in

2   common fund cases. E.g., Craft v. Cty. of San Bernardino, 624 F. Supp. 2d 1113, 1125

3   (C.D. Cal. 2008) (approving a multiplier of 5.2 and collecting cases); Vizcaino, 290 F.3d

4   at 1051 ("[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment

5   in common fund cases."), and at 1051 n.6 (finding that 83% of cases surveyed applied a

6   multiplier of 1.0 to 4.0).

7       The Court finds this multiplier justified based on the results obtained, the amount

8   of work performed, and counsel's extensive experience with wage and hour class

9   actions. Although the issues in this case were not complex, the Court notes that counsel

10  with less expertise in wage and hour class actions may have expended significantly

11  more hours to achieve the same result. See Craft, 624 F. Supp. 2d at 1123.

12  Furthermore, no class members objected to the fee award. Finally, the Court notes that

13  the lodestar does not account for co-counsel's time, or time expended in relation to the

14  final approval hearing.

15          **3.      Conclusion**

16      The Court finds the award of $100,000 in attorney's fees to be reasonable under

17  both the percentage of fund and lodestar methods.

18      **B.      Costs**

19      "There is no doubt that an attorney who has created a common fund for the

20  benefit of the class is entitled to reimbursement of reasonable litigation expenses from

21  that fund." Ontiveros v. Zamora, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citations omitted).

22  To that end, courts throughout the Ninth Circuit regularly award litigation costs and

23  expenses in wage-and-hour class actions. The settlement agreement provides that class

24  counsel may obtain up to $10,000 in costs. Plaintiff requests a lower award of $9,004.54.

25  The request is supported by counsel's declaration and an itemized bill of costs. The

26  amount sought is reasonable and reasonably proportionate to the amount of costs when

27  compared to similar settlements. See, e.g., Navarro v. Servisair, No. C 08-02716 MHP,

28  2010 U.S. Dist. LEXIS 41081, 2010 WL 1729538, at *3 (N.D. Cal. April 27, 2010)

1   (awarding $11,000 in costs in conjunction with $180,000 in attorneys' fees); Odrick v.

2   UnionBancal Corp., No. C 10-5565 SBA, 2012 U.S. Dist. LEXIS 171413, 2012 WL

3   6019495, at *7 (N.D. Cal. Dec. 3, 2012) (awarding $20,000 in costs in conjunction with

4   $875,000 attorneys' fees); Tarlecki v. bebe Stores, Inc., No. CV-05-1777 MHP, 2009

5   U.S. Dist. LEXIS 102531, 2009 WL 3720872, at *6 (N.D. Cal. Nov. 3, 2009) (awarding

6   $30,000 in costs in conjunction with $200,000 in attorneys' fees). The Court therefore

7   finds an award of costs in the amount of $9,004.54 to be reasonable.

8   **V.      OTHER DEDUCTIONS FROM THE COMMON FUND**

9       **A.      Administration Costs**

10       Plaintiffs request $6,500 in administration costs.

11       Courts regularly award administrative costs associated with providing notice to the

12   class. See, e.g., Odrick v. UnionBancal, Corp., No. C 10-5565 SBA, 2012 U.S. Dist.

13   LEXIS 171413, 2012 WL 6019495, at *7 (N.D. Cal. Dec. 3, 2012); Smith, 2016 WL

14   2909429, at *11. Here, the administration costs include all costs associated with

15   providing notice to the class, issuance of checks to class members, issuance of any

16   applicable W-2 and 1099 forms, and calculating Defendants' share of employee tax

17   withholding. The Court finds the request for $6,500 in administration costs to be

18   reasonable.

19       **B.      Incentive Award**

20       Plaintiffs request a $5,000 incentive payment to named Plaintiff Mr. Reyes.

21       "Incentive awards are fairly typical in class action cases." Rodriguez, 563 F.3d at

22   958 (citation omitted). However, the decision to approve such an award is a matter within

23   the court's discretion. See In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 463. Generally

24   speaking, incentive awards are meant to "compensate class representatives for work

25   done on behalf of the class, to make up for financial or reputational risk undertaking in

26   bringing the action, and, sometimes, to recognize their willingness to act as a private

27   attorney general." Rodriguez, 563 F.3d at 958-59. The Ninth Circuit has emphasized that

28   district courts must be vigilant in scrutinizing all incentive awards to determine whether

1   they destroy the adequacy of the class representatives. Radcliffe v. Experian Info.

2   Solutions, Inc., 715 F.3d 1157, 1165 (9th Cir. 2013). A class representative must justify

3   an incentive award through "evidence demonstrating the quality of plaintiff's

4   representative service," such as "substantial efforts taken as class representative to

5   justify the discrepancy between [his] award and those of the unnamed plaintiffs." Alberto

6   v. GMRI, Inc., 252 F.R.D. 652, 669 (E.D. Cal. 2008).

7        Plaintiffs explain that Mr. Reyes participated in this action by communicating with

8   counsel, engaging in discovery, and participating in the mediation. Mr. Reyes also bore

9   the risks of engaging in this litigation, including the possibility of blacklisting by his former

10  employer or of facing an adverse judgment for fees and costs.

11       An incentive award of $5,000 is within the range that the Ninth Circuit has

12  considered reasonable. See In re Online DVD-Rental Antitrust Litig., 779 F.3d at 947; In

13  re Mego Fin. Corp. Sec. Litig., 213 F.3d at 463; see also Harris v. Vector Marketing

14  Corp., No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several

15  courts in this District have indicated that incentive payments of $10,000 or $25,000 are

16  quite high and/or that, as a general matter, $5,000 is a reasonable amount." (citations

17  omitted)). Although in the instant case a $5,000 award is more than 80 times the amount

18  the unnamed class members can expect to receive (based on the class members'

19  estimated recovery of $608.66 per person), this factor alone is not dispositive. See In re

20  Online DVD-Rental Antitrust Litig., 779 F.3d at 947 (approving incentive award 417 times

21  larger than individual award).

22       Based on Mr. Reyes's participation in this case as set forth in his declaration, the

23  Court finds the $5,000 incentive award to be reasonable.

24       **C.    Payment to Labor Workforce Development Agency**

25       The parties have agreed that $1,000 from the settlement fund will be paid to the

26  California Labor Workforce Development Agency in relation to Plaintiffs' PAGA claim.

27  The Court approves the payment.

28       **D.    Defendants' Share of Payroll Taxes**

The parties have agreed that Defendants' share of payroll taxes shall be payed from the net settlement fund. Although the Court has maintained some skepticism regarding the fairness of deducting Defendants' share of payroll taxes from the common fund, Defendants' tax burden is ultimately quite modest. The settlement administrator estimates the taxes to be in the range of $5,247.84. The Court recognizes that Defendants' tax liability may increase slightly due to an increase in the net settlement fund resulting from Plaintiffs requesting less in costs than originally anticipated. The Court therefore approves the payment of Defendants' share of payroll taxes from the net settlement fund in amount not to exceed $10,000.

**VI.   NOTICE TO ATTORNEYS GENERAL**

At the hearing, Defendants asked that final approval be delayed until June 23, 2016 as Defendants had not timely provided notice to the appropriate attorneys general, see  28 U.S.C. § 1715(b), and thus the time for the attorneys general to object has not run, see 28 U.S.C. § 1715(d).

Upon review of the parties' submissions, the Court found that it was without information as to when the appropriate attorneys general were served with notice of the proposed settlement. Accordingly, on June 14, 2016, the Court ordered Defendants to provide such information. (ECF No. 47.) Defendants complied, stating that they mailed notices of the proposed settlement to the following attorneys general on March 25, 2016: the United States, California, Georgia, Nevada, Missouri, and Texas. (ECF No. 49.) At least one member of the settlement class resides in each of these states, according to Defendants' records of each class member's last known address.

More than ninety days have passed since service of the proposed settlement agreement on the appropriate attorneys general and no objections were received. Accordingly, the Court may finally approve the settlement. 28 U.S.C. § 1715(d).

**VII.   ORDER**

Based on the foregoing, it is HEREBY ORDERED that:

1. The Court certifies for settlement purposes, for treatment as a class action

under Rule 23 of the Federal Rules of Civil Procedure, a settlement class defined as all persons whose employment at CVS's La Habra, California or Patterson, California Distribution Centers ended any time between January 30, 2009 and October 31, 2015, and who were subject to a collective bargaining agreement, not including the La Habra, California Warehouse Agreements;

2. The Court grants final approval of the Settlement and finds the terms of the Settlement to be fair, reasonable, and adequate under Rule 23(e) of the Federal Rules of Civil Procedure;

3. The Court finds that class members were provided proper and adequate notice of their rights in a manner that satisfies the requirements of due process;

4. The Court orders that all class members who did not timely file a request for exclusion from the Settlement are barred from prosecuting against the Released Parties any and all released claims as set forth in the Settlement;

5. The Court orders that payment from the settlement fund of settlement administration fees be made to Simpluris, Inc. in the amount of $6,500 in accordance with the Settlement;

6. The Court orders that payment from the settlement fund of settlement benefits to class members who did not timely request exclusion from the Settlement be made in accordance with the Settlement;

7. The Court orders that payment from the settlement fund of $1,000 be made to the Labor Workforce Development Agency in accordance with the Settlement;

8. The Court awards the Plaintiffs the amount of $9,004.54 for litigation costs, to be paid from the settlement fund in accordance with the procedures set forth in the Settlement;

9. The Court award Plaintiffs the amount of $100,000 for reasonable attorney's fees, to be paid from the settlement fund in accordance with the procedures set forth in the Settlement;

10. The Court awards named Plaintiff Mr. Reyes the amount of $5,000 as a class representative incentive payment, to be paid from the settlement fund in accordance with the procedures set forth in the Settlement;

11. The Court directs this Order to be entered as a final judgment dismissing the action with prejudice; and

12. The Court orders that, notwithstanding entry of final judgment, the Court shall retain jurisdiction in this matter for the purposes of interpreting or enforcing the Settlement or final judgment.

IT IS SO ORDERED.

Dated:   June 28, 2016                    /s/ *Michael J. Seng*

UNITED STATES MAGISTRATE JUDGE